<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **HEARTLAND PAYMENT SYSTEMS, LLC,** | |
| *Plaintiff,* | **Civil No. 2:17-5323 (KSH) (CLW)** |
| v. | |
| **ROBERT MICHAEL VOLRATH,** | <u>Opinion</u> |
| *Defendant.* | |

Plaintiff Heartland Payment Systems, LLC ("Heartland") seeks to enjoin its former employee Robert Volrath from breaching restrictive covenants contained in his employment contract.  Heartland sued Volrath, who quit in June to work for a direct competitor, for breach of contract, specifically breach of a non-solicitation and confidentiality provision. Heartland alleges that once Volrath switched over to its competitor, he solicited three of Heartland's clients: a restaurant chain called Jethro's; a restaurant called El Fogon; and the Iowa Restaurant Association.  In addition, Heartland claims Volrath solicited Heartland employee Steven Casteel to come over to the competitor, and that he also disclosed certain confidential information to employees at his new employment, among them his son and daughter.

Heartland seeks a preliminary injunction to prevent Volrath from further alleged violations of the non-solicit and confidentiality provisions in his employment contract.

## Background

After the parties engaged in expedited discovery based on the allegations in Heartland's submissions in support of injunctive relief, the Court held a two day evidentiary hearing. The facts set forth below reflect allegations in the complaint that are not disputed, witness declarations and deposition testimony admitted into evidence at the evidentiary hearing, and the testimony of live witnesses at the hearing, including Volrath.

Heartland is a national payment processing business that sets up credit card payment systems for its clients. (D.E. 86, Amended Complaint at ¶ 24.) Heartland's presence is national: it is a limited liability company organized under Delaware laws, its principal place of business is Georgia, but the events giving rise to this dispute occurred in Iowa. (*Id.* at ¶ 15-17.) Volrath, a citizen of Iowa, worked for Heartland in Iowa and Nebraska. (*Id.* at ¶ 15, 27.) Heartland's clients range from restaurants to laundromats. Vincent Lombardo, the Chief Sales Officer at Heartland, testified at the hearing that Heartland employees solicit and maintain ongoing relationships with clients, checking in with them regularly to ensure the payment systems are working. (D.E. 56, 9/18/17 Transcript, 47:2-25.) A Heartland employee who sets up a client's payment services will receive commissions on that account until the client stops using Heartland's services. (*Id.* at 53:3-6.)

Volrath testified that he began working at Heartland in April of 2007.  (D.E. 57, 9/19/17 Transcript, 5:8.)  The following year, he was promoted to Division Manager, which increased his responsibilities to include "supervising, directing, and formulating strategy for Heartland's sales activity in Iowa and Nebraska." (D.E. 86, Amended Complaint at ¶ 27.)  In 2015, Volrath was promoted to Territory Manager, which made him responsible for selling Heartland's products and services nationwide, as well as managing a sales force.  (*Id.* at ¶ 28.)

In each of these positions, Lombardo testified, Volrath personally courted, developed, and maintained client relationships, gaining substantial knowledge of Heartland's confidential information.  (D.E. 56, 9/18/17 Transcript, 61:14-17.)  The parties do not dispute that Volrath knew "merchants' contract terms, account volume, product information…fees, margins, and commissions," as well as nationwide sales strategies, "including plans for the generation of new merchant accounts, and channels of business...product development…and methods of training, evaluating, developing, and compensating employees."  (D.E. 86, Amended Complaint, at ¶ 33.)

Upon becoming a Division Manager in 2008, Volrath signed a Division Manager Employment Agreement ("DM Agreement") that included a sweeping confidentiality clause:

> Division Manager/District Sales Manager acknowledges that, in the course of his or her employment, he or she has had and will have access to and has become and will become aware of and informed of confidential and/or proprietary information that is a competitive asset of HPS [Heartland Payment Systems] and its affiliates, including, but not limited to the terms of agreements or arrangements between HPS and any third parties,

3

merchant/client/customer lists, lists of independent sales organizations, lists of sales agents and agencies, marketing strategies, marketing methods, development ideas and strategies, personnel training, support and development programs and materials, financial results, strategic plans and demographic analyses, trade secrets, business plans, product designs, statistical data, operating procedures, computer software and programs, source codes, pricing models, product information, compensation schedules and reports, and any other information concerning HPS or any of its affiliates or the business of HPS or any of its affiliates or any employees, suppliers, resellers or customers of any of them (collectively, "Confidential Information"). DM/DSM will keep all Confidential Information in strict confidence while employed by HPS and thereafter and will not directly or indirectly make known, divulge, reveal, furnish, make available or use any Confidential Information (except in good faith in the course of his or her regular authorized duties on behalf of HPS and for the benefit of HPS). Upon termination of his or her employment with HPS, or upon request by HPS, DM/DSM shall destroy or deliver to HPS all Confidential Information that is in human or machine readable form that is then in the possession or control of DM/DSM. DM/DSM's obligations of confidentiality hereunder will survive the termination of this Agreement until and unless any such Confidential Information becomes, through no fault of DM/DSM, generally known to the public or Division Manager/District Sales Manager is required by law to make disclosure (after giving HPS notice and an opportunity to contest such requirement). DM/DSM's obligations under this section are in addition to, and not in limitation or preemption of, all other obligations of confidentiality, which DM/DSM may have to HPS under general legal or equitable principles.

(D.E. 86-1, Ex. A., DM Agreement, at 3-4 ¶ 8.)

There was also a non-solicitation clause providing that, in the event of his leaving Heartland, Volrath would not solicit a Heartland merchant for a period of 12 months.  Specifically, Volrath agreed not to "directly or indirectly, solicit, entice or induce any HPS Merchant or other party having a contractual or business relationship with HPS to terminate or modify its contractual or business relationship with HPS or assist any other person or entity to do so." (*Id.* at 4 ¶ 9(a).)  That time restriction is extended to a full 60 months if Volrath earned a commission on the account. (*Id.*)  Additionally, the non-solicitation agreement

4

prohibited Volrath from recruiting Heartland employees for 24 months in the event he left Heartland.   (*Id.* at 4 ¶ 9(b).)   The contract contains an acknowledgment that a breach would result in immediate and irreparable harm to Heartland, warranting injunctive relief.  (*Id.* at 5 ¶ 10.)

The record indicates that during his employment with Heartland between 2007 and 2017, Volrath successfully solicited, maintained, and earned commissions and residuals on many merchant accounts. Then on June 9, 2017, he resigned. (D.E. 86, Amended Complaint, ¶ 58.)  As part of the resignation process, Volrath signed a Partial Commission Purchase Agreement ("PCPA") that prohibited him, for 36 months, from soliciting Heartland merchants from whom he earned compensation.  (D.E. 30-2, Ex. C, PCPA Agreement, ¶ 4.)   He immediately began working for Above and Beyond ("Beyond"), a direct competitor of Heartland. According to his testimony, his job at Beyond is essentially the same as his job at Heartland.  (D.E. 57, 9/19/17 Transcript, 8:6-14.)

In his testimony, Volrath did not dispute that he kept and shared some of Heartland's confidential information.  He testified that within hours after he resigned, he sent emails containing financial information about certain Heartland clients to his son Justin Volrath, Beyond's Vice President of Sales; his daughter Victoria Veatch, a Beyond employee; and Alan Bernard, another Beyond employee. (D.E. 56, 9/18/17 Transcript, 8:1-25.)  Volrath further testified that he emailed Justin Volrath a list of Heartland's top performing sales employees, and admitted in

his testimony that this constituted confidential information.  (D.E. 57, 9/19/17 Transcript, 28:7-17.)

According to Volrath, before his daughter Victoria left Heartland to work at Beyond, she had worked unofficially as his assistant.   During that time, Volrath emailed Victoria his password to Heartland's Atlas and Portfolio Manager database. (*Id.* at 148:24-25.)  Using his personal email, Volrath also emailed to himself lists of Heartland's existing, prospective, and 'in progress' customers.  (D.E. 56, 9/18/17 Transcript, 8:1-12.)

 In his deposition testimony, Volrath justified keeping those lists because "a lot of my customers are my friends, and I still frequent their business."  (D.E. 30-1, Volrath Deposition, 20:7-9.)  As an example of this, he noted that Pleasant Hill Dry Cleaners used to be his client with Heartland, and he still uses them for his dry cleaning.   When it was pointed out that he could simply Google contact information for Pleasant Hill Dry Cleaners, he responded "Well, I don't know that for sure, but I would guess you could."  (*Id.* at 20:19-21.)

The parties agree that Volrath enrolled a Mexican restaurant, El Fogon, as a Heartland merchant one month before he quit.  Blanca Plascencia, the owner of El Fogon, signed a merchant agreement with Heartland. Volrath scheduled El Fogon for installation of payment devices, which had not yet happened by the time he went over to Beyond.  Blanca Plascencia submitted a declaration stating that Volrath offered to switch El Fogon to Beyond on the same price terms.  (D.E. 31-5, Plascencia Declaration, ¶ 5.)  She accepted his offer, and Volrath proceeded to set

her up with Beyond.  (*Id.* at ¶ 6.)  As it turned out, a few months later, Plascencia switched back to Heartland because she was not satisfied with Beyond's services. (*Id.* at ¶ 7.)

In June of 2017, Volrath paid a visit to Chuck , the CEO of a chain of restaurants called Jethro's—one of Heartland's largest accounts in Iowa—and gave him what Collins described as "the salesman's pitch for Beyond."  (D.E. 30-3, Collins Deposition, 72:6-7.)  Collins told Volrath he would look into the Beyond pricing information once Volrath sent it.  He testified that Volrath told him that he would "have to put [Collins] in touch with somebody else" at Beyond, and asked Collins to consider their personal relationship in deciding whether to switch to Beyond.  (*Id.* at 73:1-12.)

Four  days before he resigned from Heartland, Volrath called Jessica Dunker, the CEO of the Iowa Restaurant Association ("IRA") to arrange an in-person meeting for the following week.  (D.E. 30-4, Dunker Declaration, ¶ 11.)  The parties agree that the IRA is an account that Volrath obtained for Heartland and on which he earned a commission.  (D.E. 86, Amended Complaint, at ¶ 82.)  At the meeting, according to Dunker's declaration, Volrath "in words or in substance" expressed his interest in switching the IRA from Heartland to Beyond.  (D.E. 30-4, Dunker Declaration, ¶ 12.)

After he resigned, Volrath also had conversations with Steven Casteel, a Division Manager at Heartland.  Casteel testified that on June 23, 2017, Volrath

recruited him to switch from Heartland to Beyond.  (D.E. 3-3, Casteel Declaration, at ¶ 35.)

# DISCUSSION

## Which Contract Governs the Issue

As the foregoing indicates, Volrath was signatory to two agreements with Heartland, one, the Division Manager Employment Agreement (DM Agreement), signed when he became a Division Manager in 2008, and the other, the Partial Commission Purchase Agreement (PCPA), signed in conjunction with his leaving Heartland in 2017. and (D.E. 86-1, Ex. A, DM Agreement; D.E. 30-2, Ex. C, PCPA Agreement.)

Volrath maintains that the PCPA supersedes the DM Agreement with respect to his post-employment non-solicitation obligations.  (D.E. 32; Volrath's Memo of Law as to the Contract that Governs This Dispute; at 20.)

This argument is weakened by the titles given to the contracts.  The DM Agreement contains 13 paragraphs that explain various aspects of his employment, including Volrath's at-will employment status, his general responsibilities and compensation, what constitutes termination for cause, and what happens if he dies or is disabled.  The DM Agreement also contains a confidentiality clause, a non-solicitation clause, and a remedies clause, all of which Heartland argues control his obligations as a former employee.

The PCPA is, as its name suggests, narrower than the DM Agreement. Heartland's attorneys represented at oral argument that under the PCPA, Volrath

could choose to receive residuals on the merchant accounts he set up for as long as each merchant uses Heartland's services.  (D.E. 56, 9/18/17 Transcript, 54:1-3.) Alternatively, Volrath could get a lump sum equal to 30 months of commissions in exchange for selling back his rights to those residuals.  (D.E. 30, Heartland's Brief Regarding the Restrictive Covenants in Volrath's Employment Agreement, at 6.) Heartland's brief explains that buyouts are a favorable option because the employee gets cash up front and avoids the risk of the merchant leaving Heartland within 30 months.  (*Id.* at 7.)  In the PCPA, there is a non-solicitation that prohibits an employee exercising the option from soliciting for three years any Heartland merchant from which the employee has earned compensation.  (D.E. 30-2, Ex. C, PCPA Agreement, ¶4.)

When he signed the PCPA in June 2017, Volrath agreed to the lump sum buyout as to specific merchant accounts.  According to Vincent Lombardo, the Chief Sales Officer at Heartland, the list of merchants was not exhaustive of every merchant with whom Volrath did business.  (D.E. 56, 9/18/17 Transcript, 66:3-9.)

Volrath argues that once he left and went to Beyond, the restrictive language in the PCPA governed his relationships with his former Heartland clients.  He testified that he believed the non-solicitation clause in the PCPA superseded the non-solicitation clause in the DM Agreement, and reduced the time restriction from doing business with merchants from whom he earned a commission from five years to three. (D.E. 57, 9/19/17 Transcript, 13:21-25.)  The PCPA states that "[t]his agreement…comprises the entire agreement between the parties hereto *with respect*

*to the subject matter hereof* and supersedes all prior and contemporaneous agreements and understandings." (D.E. 30-2, Ex. C, PCPA Agreement, at ¶ 7) (emphasis added). Volrath argues his interpretation is proper because the non-solicitation clause of the PCPA is part of its 'subject matter,' and therefore the integration clause of paragraph seven renders the PCPA the controlling agreement. (D.E. 32, Volrath's Memo of Law as to the Contract that Governs This Dispute, at 20.)

A more logical reading of the PCPA is that the document concerns what it says it concerns: the purchase of partial commissions related to merchant accounts. In contrast, the DM Agreement is a contract regulating the terms of Volrath's employment. Given the subject matter the PCPA deals with, its non-solicitation clause independently supplements, rather than supersedes, the non-solicitation clause of the DM agreement, which goes into effect when an employee resigns from Heartland. By contrast, the PCPA goes into effect once an employee exercises his or her right to a buyout, which can happen before or after the employee has left Heartland. As Heartland points out in its papers, the PCPA prevents any former employee whose non-solicitation clause under the DM Agreement is running out, from getting a buyout on his Heartland merchant account, and then poaching that client. (D.E. 30, Heartland's Brief Regarding the Restrictive Covenants in Volrath's Employment Agreement, at 8.)

As Heartland argues, it would make little sense to find that a departing employee going over to a competitor enjoys fewer restrictions after signing the

PCPA than would otherwise control. To the extent that the two time periods do not appear to harmonize, there exists a larger question about whether either one is consonant with what courts have found to be a reasonable time restriction. For purposes of determining whether temporary injunctive relief is warranted, however, the Court finds that the non-solicitation clause in the DM Agreement governs this dispute.

## Preliminary Injunction Standard

To obtain a preliminary injunction, Heartland must establish "(1) that [it] is likely to succeed on the merits, (2) that [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [its] favor, and (4) that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also*, *HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 171 (3d Cir. 2015). Preliminary injunctions are an "extraordinary remedy, which should be granted only in limited circumstances." *Frank's GMC Truck Ctr. Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988). The district court's decision whether to grant an injunction is "discretionary." *EBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

## Preliminary Injunction Analysis

## I.    Likelihood of Success on the Merits

The substantive inquiry here is whether the confidentiality clause and the non-solicitation clause in the DM Agreement—collectively the restrictive covenants—are enforceable.

Under New Jersey law,[1] a restrictive covenant is enforceable if it "(1) simply protects the legitimate interests of the employer, (2) imposes no undue hardship on the employee, and (3) is not injurious to the public." *Solari Indus., Inc., v. Malady*, 55 N.J. 571 (1970); *see also HR Staffing*, 627 F. App'x at 172. A restrictive covenant will not be enforced "merely to aid the employer in extinguishing competition, albeit competition from a former employee." *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 635 (1988).

### Prong 1: Protecting the Legitimate Interest of Employer

Courts consistently find that good will, reputation, and confidential business information are legitimate interests worthy of protection. *See e.g.*, *HR Staffing*, 627 F. App'x at 171; *Lamorte v. Burns*, 167 N.J. 285, 301 (2001); *Ingersoll-Rand*, 110 N.J. at 636; *American Financial Resources v. The Money Source*, No. 14-1651, 2014 WL 1705617 (D.N.J. Apr. 28, 2014).

As to good will and reputation, courts find that developing client relationships through trips, meals, and other expenses is the "sort of expenditure of energy and money significant when determining whether client information is worthy of protection." *Saturn Wireless Consulting, LLC v. Aversa*, No. 17-1637, 2017 WL 1538157, at *5 (D.N.J. Apr. 26, 2017); s*ee also A.T. Hudson & Co. v. Donovan*, 216 N.J. Super. 426, 434 (App. Div. 1987) (upholding a non-solicitation agreement and noting that certain employers "expend great energy and money in soliciting clients and developing projects for their benefit. Each client that plaintiff

---

[1] A forum selection clause in the employment contract applies New Jersey law. (D.E. 86-1, DM Agreement, ¶13(j).)

is able to attract represents a significant investment of time, effort and money which is worthy of protection.").

Heartland is seeking to protect its relationships with its clients.  Vincent Lombardo, the Chief Sales Officer at Heartland, testified that Heartland exerts a lot of energy and resources to court and keep clients.  (D.E. 56, 9/18/17 Transcript, 61:14-17.)   In this sales industry, Lombardo explained, client development and relationships between the clients and the account managers are at a premium.

Lombardo testified that "[Volrath] has been around a long time in Iowa and Iowa is a small community. Everybody knows everybody in Iowa. And Mike had been not just a great and successful sales professional, but somebody that really has held the fort.  He is the Heartland face, when people say Iowa." (*Id.* at 52:10-14.)  As Lombardo's testimony established, Volrath is exceedingly capable of using his personal relationships with the merchants to Heartland's detriment and Beyond's benefit.  Protecting against that is a legitimate business interest.

Regarding confidentiality, merely stating certain information is "confidential" is not enough for a court to consider it so.  For example, the court in *Saturn Wireless* found client relationships worthy of protection through an injunction, but declined to enjoin dissemination of purported confidential information because it largely consisted of "publically available marketing fliers." *Saturn Wireless*, 2017 WL 1538157, at *14.

The parties agree that through Volrath's various positions at Heartland, he was exposed to "merchants' contract terms, account volume, product

information…fees, margins, and commissions," as well as nationwide sales strategies, "including plans for the generation of new merchant accounts, and channels of business…product development…and methods of training, evaluating, developing, and compensating employees." (D.E. 86, Amended Complaint, ¶ 33; D.E. 90, Answer, ¶ 33.) Volrath disagrees as to the confidential nature of this information. (D.E. 90, Answer, ¶ 33.) Knowing about merchant contract terms is especially important because, as was represented at oral argument after the evidentiary hearing, each merchant contract is negotiated individually. Rather than offering a single price for payment services, or a range of prices based on the services required, each client can negotiate price terms with its Heartland representative. Heartland pricing information is, therefore, not analogous to the "publically available marketing fliers" in *Saturn Wireless*. The inference is clear that a competitor —with this pricing information in hand—could successfully court a Heartland client. The Court finds that Heartland has a legitimate interest in protecting this type of confidential information. [2]

### Prong 2: Undue Hardship

Relevant factors for determining whether restrictive language imposes undue hardship on the employee include how hard it is for the employee to find other

---

[2] It may be that the volume of what is considered "confidential information" under the DM Agreement is open to challenge. It must be emphasized, however, that Volrath is doing the same work for Beyond that he did for Heartland. He chose to take certain Heartland information with him that he considered necessary to be an effective salesman at Beyond. What was valuable to Heartland, in short, is going to be valuable for Beyond. Under these circumstances, the Court need not parse the contractual terms other than to agree with Heartland that the information Volrath took and shared constitutes confidential information covered by the DM Agreement.

work, and, significantly, whether the employee knowingly risked violating the restrictive covenant by choosing to work for a competitor.  *See HR Staffing*, 627 F. App'x at 172-73.  If an employee did roll the dice by voluntarily quitting in order to work for a competitor, the employee "cannot self-generate hardship by arguing that he may be terminated [from new employment] because this gamble did not turn out as planned."  *Chemetall US Inc. v. Laflamme*, No. 16-780, 2016 WL 885309 (D.N.J. March 8, 2016); *see also HR Staffing*, 627 F. App'x at 172 (finding the employee brought the hardship on himself).

Volrath emailed himself client lists (the equivalent of walking out with hard copy) using his personal email mere hours after resigning, and immediately began working for Beyond.  The language against solicitation, it should be noted, is not a non-compete provision.  Heartland does not seek to prevent Volrath from earning a livelihood in his chosen field of work.  Volrath is not barred from working for a competitor in the payment processing industry. Rather, the narrow purpose of the non-solicitation is to keep Volrath and his subsequent employer from poaching Heartland's own clients and employees.  (*See generally* D.E. 86-1, Ex. A, DM Agreement.)  Hardship—including the impact of this litigation on Volrath—cannot be considered excessive under the evidence in this case.

### Prong 3: Injury to the Public

The third prong asks whether the non-solicitation language and the restrictions as to confidential information are injurious to the public.  Courts tend to

reject restrictive covenants if they prohibit medical professionals from practicing medicine, or if they unduly stifle competition. *See HR Staffing*, 627 F. App'x at 172.

The services Heartland provides, while important to commerce, are not so specialized and vital as to trigger public policy concerns analogous to those raised by restrictions imposed on medical professionals. Nor is there evidence that Heartland has a monopoly over credit card payment processing. At his videotaped deposition, which Heartland introduced into evidence, Steven Casteel testified that Independent Sales Organizations (ISOs), smaller businesses that also offer credit card payment services, number in the 3,000s, and that he gets recruiting calls from an ISO on a weekly basis.

Duration is also relevant in determining whether the covenants injure the public. One and two year restrictions are consistently upheld. *See e.g.*, *Cmty. Hosp. Grp., Inc., v. More*, 183 N.J. 36, 59 (2005); *Trico Equip. Inc., v. Manor*, No. 08-5561, 2009 WL 1687391 at *7 (D.N.J. June 13, 2009). At issue here are three different time restrictions. Volrath may not solicit any Heartland merchant for one year, he may not solicit any Heartland employee for two years, and he may not solicit for five years any Heartland merchant on whose merchant account he earned commissions. Albeit this last time period is more than double what most courts in New Jersey uphold as reasonable, the focus right now is whether Volrath should be enjoined on a preliminary basis until a final decision is made in this litigation.

An injunction at this point is particularly appropriate given the ample evidence that Volrath breached the non-solicitation and confidentiality agreement.

Volrath admits he did not return or destroy confidential Heartland information as he was supposed to under the agreement. (D.E. 57, 9/19/17 Transcript, 28:1-6.) Volrath admits he sent an email to his son, who happens to be Beyond's Vice President of Sales, with a list of Heartland's top performing sales employees and their estimated profits. (*Id.* at 28: 7-17.) Volrath admits this is confidential information; referring to the aforementioned email, Volrath was asked "And that's confidential information, isn't it?" To which Volrath responded, "Yes, it is." (*Id.* at 35:4-8.) Volrath also testified that a mere four hours after he resigned from Heartland, he sent himself on his personal email a list of Heartland merchants who had signed contracts but had not yet had equipment installed. (*Id.* at 45:15-47:20.)

Volrath also admits he solicited El Fogon, a Heartland merchant, to switch to Beyond in spite of its current contract with Heartland. (*Id.* at 45:15-47:20.) In fact, he succeeded in convincing Blanca Plascencia, the owner of El Fogon, to switch to Beyond. He also admits that he gave a Beyond sales pitch to the manager of a restaurant chain Jethro's who he had worked for while at Heartland. (*Id.* at 79:1-19.) Volrath admits that after he went over to Beyond, he set up a meeting with Jessica Dunker, the president of Iowa Restaurant Association, which has an exclusive agreement with Heartland. Dunker testified that Volrath reminded her that its exclusive agreement with Heartland would expire in a few months, and that she should consider Beyond as an alternative. (D.E. 30-4, Dunker Declaration, ¶ 3-4.)

Proof of previous violations is not required to grant injunctive relief; Heartland need only show a likelihood that Volrath will, in the future, violate the restrictive covenant. While "past actions cannot be remedied through injunctive relief, such facts can be considered as to the strength of Plaintiff's proof." *Menasha Packaging*, 2017 WL 639634, at *8. Volrath's prior breaches allow a strong presumption that he will breach again. It is an easy inference that but for Heartland's swift response to his solicitations, Volrath would have continued.

## II. Irreparable Harm

The second requirement for a preliminary injunction is a showing that the plaintiff would otherwise be irreparably harmed. If money damages are calculable, injunctive relief is inappropriate. *Frank's GMC Trust Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988); *see also American Financial Resources v. The Money Source*, 2014 WL 1705617, at *11. If the only harm is lost sales, money damages can make the defendant whole, and injunctive relief is inappropriate. *Touzot*, 2016 WL 1688089, at *11 (holding that while the plaintiff demonstrated a likelihood of success on proving a breach of a non-compete, the only damages were lost sales, and the court did not issue an injunction). In contrast, harm resulting from interfering with client relationships is "irreparable because it could not be adequately ascertained or compensated by money damages." *Fres-co Systems USA, Inc. v. Hawkins*, 690 F. App'x 72, 76 (3d Cir. 2017).

The district court found a company to be irreparably harmed when two of its employees quit and began working for a competitor in violation of a restrictive

covenant because of "an imminent risk of [the employees] soliciting former clients." *ADP, LLC v. Lynch*, No. 16-1053, 2016 WL 3574328, at *8 (D.N.J. June 30, 2016). In another case, the court emphasized that the harm was the "continued use" of confidential information to solicit clients, "not merely the disclosure" of the confidential information that rendered injunctive relief appropriate. *The Money Source*, 2014 WL 1705617, at *12. Merely promising not to violate a restrictive covenant, especially after the employee already did so, is considered "self-serving" and "unpersuasive." *Chemetall*, 2016 WL 885309, at *10.

The Third Circuit recently affirmed a finding of irreparable harm even when the defendant swore in an affidavit that he would not disclose any confidential information while working for the competitor, and the competitor also directed the employee not to disclose any confidential information. *Fres-co Systems*, 690 F. App'x at 72. In a similar case, the Third Circuit found that an employee who began working for a competitor had "changed loyalties" and "could be willing to disclose damaging information, or, at the very least, allow the information to influence his actions [while working for the competitor] to the detriment of [the plaintiff]." *HR Staffing*, 627 F. App'x at 174. There, the Third Circuit upheld the district court's finding of irreparable harm because of the "concrete risk" that plaintiff's "confidential information might be used in a fashion that could cause it irreparable harm." *Id.*

As noted above, Volrath admits he solicited several Heartland merchants and sent himself and Beyond confidential Heartland information after resigning. Even

if damages can be calculated from the lost business while El Fogon was temporarily with Beyond, it is reasonable to assume that Heartland's relationships with El Fogon, Jethro's, and the IRA are likely to be affected by Volrath's actions. As a practical matter, a small business accustomed to working directly with a particular sales representative may easily be convinced to switch payment processing companies in order to stay with its rep. Volrath took advantage of the personal connections he made while at Heartland to convince Heartland costumers to switch to Beyond. The evidence Heartland adduced establishes that the "concrete risk" and "changed loyalties" about which Third Circuit cases have cautioned are in play.

## III.    Balance of Equities

The third question in the preliminary injunction analysis concerns the balance of equities. In deciding, courts are not sympathetic to employees who bring hardships upon themselves. For example, the Third Circuit in *HR Staffing* found that when the defendant "willfully breach[ed] a valid restrictive covenant, the harm to [him] is a predictable consequence of [his] willful breach and…is not the type of harm from which we seek to protect [him]." *HR Staffing*, 627 F. App'x at 174 (quoting *Laidlaw Inc. v. Student Transp. Of Am., Inc.*, 20 F. Supp. 2d 727, 768 (D.N.J. 1998)).

Heartland has amassed substantial evidence that Volrath engaged its merchants in discussions that ranged from dangling a future relationship with Beyond, to reversing the course of El Fogon's trade from Heartland to Beyond. Volrath himself admitted keeping certain confidential information in his possession

after he left Heartland and even directly sharing it with Beyond employees within hours after he quit Heartland. Such conduct tips the balance of equities in Heartland's favor.

## IV. Public Interest

In *HR Staffing*, the Third Circuit held, without discussion, that enforcing contracts is generally good for society. *HR Staffing*, 627 F. App'x at 174. The Court has already analyzed whether enforcement of the restrictions in the DM Agreement would be in the public interest. Heartland has established itself in the payment services industry, which is highly competitive and strongly service-oriented. Enforcing reasonable protections for its interests in maintaining merchant relationships is not against the public interest, particularly where the conduct of a former employee openly seeks to upend those relationships contrary to specific contractual obligations.

The public interest, it can be argued, is served rather than harmed by enjoining Volrath and subjecting him now to enforcement of the terms of the DM Agreement by Court order. As indicated earlier, Volrath told Collins, the CEO of Jethro's, to consider their personal relationship in deciding whether to switch from Heartland to Beyond. And yet Volrath also told Collins he would have to work with a different representative at Beyond. This half-hearted recognition of the contractual restrictions on Volrath exposes his awareness of them, and, as important, subjects the public, in the person of Collins, to uncertainty and possible commercial embarrassment.

## Conclusion

Based upon the foregoing, the Court will grant injunctive relief. The language for a preliminary injunction proposed by Heartland (D.E. 62-1) tracks the provisions in the DM Agreement, and the Court will accept it pending further orders. Both sides are reminded that judges in this District have tailored permanent injunctive relief in various ways, and it may be that some narrowing is appropriate and inevitable. For now, however, Heartland's evidence has established that this defendant quickly attempted to, and in one instance did effectively (if temporarily) move upon Heartland's customers, and that he kept and disseminated confidential information. Broad injunctive relief at this juncture is appropriate, and so are prompt efforts under the guidance of Magistrate Judge Cathy Waldor to resolve this matter. An appropriate order will be entered.

s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

Dated:  December 30, 2017